In re Larry PORTNOY, Debtor.

MARINE MIDLAND BANK, Plaintiff,

v.

Larry PORTNOY, Defendant.

Bankruptcy No. 95 B 45452 (TLB).
Adv. No. 96/8312 A.

United States Bankruptcy Court,
S.D. New York.

Oct. 7, 1996.

Kleban & Samor, P.C. by Elliot I. Miller, Southport, CT, for Debtor.

Phillips, Lytle, Hitchcock, Blaine & Huber by William J. Brown, David J. McNamara, New York City, for Marine Midland Bank.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Chief Judge.

At the heart of this debtor's summary judgment motion lies an irrevocable offshore trust into which he placed virtually all of his assets at a time when he knew that his personal guarantee of his corporation's indebtedness was about to be called. The debtor, Larry Portnoy, claims not only that his assets have been successfully insulated under the law of the Jersey Channel Islands

("Jersey"), but that he is entitled as a matter of law to a discharge of all debts including the indebtedness which he guaranteed. Marine Midland Bank ("Marine"), which holds Portnoy's guarantee and feels bruised by his actions, seeks to deny him a discharge under sections 727(a)(2)(A) and (a)(4) of the Bankruptcy Code on the theories that he engaged in a deliberate scheme to conceal assets and intentionally or recklessly omitted from his bankruptcy schedules his substantial "control powers" in the offshore trust. Alternatively, Marine seeks to exempt from discharge its debt alone because, it says, Portnoy willfully and maliciously transferred his assets in order to injure Marine.

In his answer to Marine's complaint, Portnoy denied that (1) I have jurisdiction over the offshore trust, the case,[1] and the adversary proceeding; (2) his estate encompasses the assets in the offshore trust; (3) he owns his salary which he deposits weekly in his wife's bank account; (4) Marine was his creditor at the time he created the offshore trust; (5) after he transferred the assets to the offshore trust and deposited his salary in his wife's bank account, he was left with insufficient assets to pay his debts; (6) he has any "control powers" over the offshore trust or that such powers are material to the bankruptcy estate; (7) his bankruptcy schedules were untruthful or that he knowingly or recklessly made a false oath in connection with this case; and (8) he had any intent to conceal assets from or willfully and maliciously injure Marine. Portnoy also pleaded several affirmative defenses bottomed on my asserted lack of jurisdiction over the trust and his salary or on Marine's claimed laches and bad faith.

So far as uncontested the facts are set forth below.

### I.

#### A. Creation of the Trust

In March 1987, Portnoy, the former president and sole shareholder of Mary Drawers,

---

1. It would appear that the denial of my jurisdiction over the voluntary chapter 7 case was a pleading error caused by a general denial of a particular paragraph of the complaint. In this motion for summary judgment Portnoy nowhere challenges my jurisdiction over the chapter 7 case which he commenced voluntarily.

Inc. ("Mary Drawers"), unconditionally guaranteed any existing and future indebtedness of that entity to Marine. Just about one year later, in March 1988, Marine loaned Mary Drawers in excess of $1 million.

In August 1989, Portnoy established a trust ("the offshore trust") in St. Helier in Jersey, and executed a declaration of trust naming Jarden Morgan Trustees (Jersey) Ltd. as sole trustee ("Jarden"), as himself "Principal Beneficiary," and his two children as additional beneficiaries. Over the course of the next several months Portnoy transferred his assets to that trust. Northington Decl. ¶ 12 at 7; Ex. "3," Debtor's Dep. at 163–164 (October 3, 1995). An inference can be drawn that the timing was purposeful, for in June, two months before the trust's creation, Portnoy knew that Mary Drawers was in trouble and by December of that same year, Mary Drawers had defaulted on its obligations to Marine.

The declaration of trust provides that it shall be governed by Jersey law and purports to vest exclusive jurisdiction over the trust's interpretation in the Jersey courts. Jarden has no office, employees, or telephone listing in the United States and conducts no business here.

As identified by the parties, some of the important trust provisions include:

5. *POWER OF ADVANCEMENT OF CAPITAL.* The Trustees shall have power at any time before the Vesting Day [2] ... [to] transfer or apply the whole or any part or parts of the capital of the Trust Fund to or for the benefit of all or any one or more to the exclusion of the others or other of the Beneficiaries or Default Beneficiaries ... in such manner as the Trustees shall in their absolute discretion think fit and so that any capital so paid, transferred or applied shall be freed and discharged from the trusts, powers and provisions hereof.

9. *POWER TO CONSIDER WISHES OF PRINCIPAL BENEFICIARY.* In the exercise of their powers and discretions hereunder the Trustees may if they think fit so to do have regard to but shall in no way be bound by the wishes in writing of the Principal Beneficiary or the wishes of any other person who may be nominated in writing by the Principal Beneficiary to the Trustees from time to time.

13. *POWER TO IGNORE INTERESTS.* The Trustees in exercising any of the powers and discretions hereby conferred in favour of any particular person or persons are hereby expressly authorized to ignore entirely the interest of any other person interested or who may become interested hereunder.

26. *REMOVAL OF TRUSTEES.* (1) The Principal Beneficiary shall have power (subject to sub-clause (2) of this Clause 26) at any time or times before the Vesting Day in his absolute discretion and without giving any reasons therefor by notice in writing given to the Trustees ... to remove any or all of the Trustees from office and to appoint one or more other persons (wherever resident or domiciled) to be a Trustee or Trustees in place of the Trustee or Trustees so removed. (2) Unless there is only one Original Trustee hereof the Principal Beneficiary shall not be capable of exercising the power conferred by sub-clause (1) hereof unless after the exercise of that power there will be at lease [sic] two Trustees hereof.

27. *DIVESTING OF TRUSTEES.* (1) The Principal Beneficiary shall have the power at any time or times before the Vesting Day by instrument or instruments in writing to nominate any person (wherever resident or domiciled) as Successor Trustees and such persons shall while liv-

---

2. According to the Declaration of Trust:
"the "Vesting Day" shall mean the first of the following to occur namely:—
(i) the day on which the period of 100 years from the date of this Instrument shall expire;
(ii) the day on which the period of 20 years commencing on the death of the last survivor of the issue living at the date hereof of his late Majesty King George VI shall expire; or
(iii) such day or days as the Trustees may declare by Instrument in writing on or before such day or days to be the Vesting Day and such declaration may expressly be related to the whole or any part or parts of the Trust Fund."
There is no contention that the Vesting Day has occurred.

ing or in existence and unless and until any further nomination is made under the power conferred by this sub-clause be the Successor Trustees for the purpose of this clause....

30. *EXCLUSION OF BENEFICIARIES AND DEFAULT BENEFICIARIES.* The Trustees shall have the power at any time or times before the Vesting Day by instrument in writing revocable before the Vesting Day or irrevocable to declare that any persons or charitable bodies described in such instrument who are, would or might but for this Clause be or become beneficiaries or Default Beneficiaries or otherwise be able to benefit hereunder shall thenceforth or from such later time falling before the Vesting Day as may therein be specified and whether permanently or for such period as may therein be specified:—(1) be wholly or partially excluded from benefits hereunder; or (2) cease to be Beneficiaries or Default Beneficiaries (whether beneficially or in some fiduciary capacity) in relation to the whole or any part or part of the Trust Fund or the income therefrom....

Ex. "14," Marine's Opp'n to Motion for Summary Judgment.

The total realizable value of the assets transferred to the trust approximated $700,000; the declared transfer value was $1,045,943. Northington Decl. ¶ 6 at 4; Marine's Statement of Facts ¶ 1(d) at 2. From 1989 to the present, Portnoy has filed required annual forms regarding the offshore trust with the United States Treasury Department.

### B. Portnoy's Salary and Real Estate

Apparently, Portnoy was not satisfied with only removing assets from Marine's reach but decided that he had to protect his earned income as well. Starting sometime in 1990, Portnoy began, and to this day continues, to deposit all of his salary, at least $150,000 per annum, into a bank account in his wife's name. For a short period of time prior to that, Portnoy had transferred his weekly salary into an account in the name of his daughter, Melissa. Notwithstanding these transfers, Portnoy exercised sole check writing authority over the accounts.

Real property received similar treatment. In 1990 or 1991, Portnoy transferred to Mrs. Portnoy a joint interest in their home and all the proceeds from the sale of his condominium located in Florida. Ex. "9," Debtor's Dep. at 95–97 (February 2, 1995).

### C. Marine Sues Portnoy and Discusses Settlement

On February 22, 1990, Marine sued Portnoy on his guarantee in New York State Supreme Court, New York County. Ex. "16," *Marine Midland Bank v. Portnoy,* No. 104830/95, slip op. at 2–3 (Sup.Ct.N.Y. County Sept. 8, 1995) (Davis, J.).

In early 1991, Portnoy, Marine and their respective counsel met to discuss a possible settlement of Marine's suit. Portnoy had previously supplied Marine with a financial statement dated June 30, 1989, which indicated his net worth at $2,104,250, showing assets of cash ($242,500), real estate ($1,000,000 encumbered by a $319,000 mortgage), government and marketable securities ($141,250), sundry partnerships ($350,000), equity in a corporation ($615,000) and an Individual Retirement Account ($34,500). Ex. "5," Marine's Opp'n to Motion for Summary Judgment.[3] During the settlement conference, Portnoy told Marine that he had been financially ruined by expensive experimental cancer treatments, that his assets other than real estate "were all gone," and that he had no unencumbered assets with which to satisfy his indebtedness to Marine. Notwithstanding his actual $150,000 plus annual salary, Portnoy also said he was earning only $1,700 per month as an employee in the garment industry, an amount insufficient to service his debt to Marine. Northington Decl. ¶ 22 at 12. Portnoy does not now dispute that he made those statements; instead he coyly argues that I am precluded from considering them because, if made, they were made in the context of a settlement negotiation.

---

3. Marine contends that these are the same assets that were used to fund the trust, as reflected in the trust forms annexed as Ex. "K" The debtor does not now contest this assertion.

## D. Marine's Judgment and Enforcement Proceedings

When settlement efforts failed Marine pursued its litigation, obtaining, in September 1991, judgment against Portnoy for $183,891.92, which, together with post-judgment interest, remains outstanding today. Earlier that year Mary Drawers was involuntarily petitioned into bankruptcy; it is no longer in business.

In October 1994, counsel to the Mary Drawers trustee in bankruptcy informed Marine that Portnoy was employed and earning an executive's salary at a company called Dawn Joy Fashions. With this discovery, Marine commenced supplementary proceedings to enforce its judgment. In 1995 Marine began garnishing 10% of Portnoy's salary. Pursuant to a subpoena obtained in the supplemental proceedings, Marine deposed Portnoy on January 19, 1995, and again on February 2, 1995. At that time, he disclosed to Marine for the first time the existence of the offshore trust and his practice of depositing his salary into an account in Mrs. Portnoy's name. Portnoy also provided Marine with a copy of the declaration of trust. Armed with this new information, Marine initiated an action against Mr. and Mrs. Portnoy (i) to recover Portnoy's salary and the trust assets as fraudulent conveyances and (ii) to enjoin Portnoy, Mrs. Portnoy, and Jarden from transferring or dissipating assets. During the pendency of that action, Marine moved the state court for an order to compel Portnoy to make weekly installment payments on the judgment. In May 1995, the state court vacated a previous temporary restraint against Mrs. Portnoy's use of her account but granted a preliminary injunction enjoining Portnoy from transferring any assets. The order granting the preliminary injunction was entered in July 1995 and was timely appealed.

In September 1995, the state court granted Marine's demand for an installment payment order and directed Portnoy to make weekly installments in the amount of $1,250 to Marine until the judgment were fully satisfied. Portnoy appealed that order and moved for a stay pending appeal, which was denied on October 26, 1995. Within a month, Portnoy filed a chapter 7 petition. The bankruptcy schedules which were filed contemporaneously with the petition identify the debtor's interest in the offshore trust as "one of the beneficiaries as determined by the trustees in their sole discretion."

## II.

We begin with the threshold issue of whether I may consider what Portnoy told Marine during their settlement discussions. Portnoy's argument that his statements are shielded by Federal Rule of Evidence 408 misapprehends the significance of the rule, which provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity of or amount, is not admissible *to prove liability for or invalidity of the claim or its amount.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible. *This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.* This rule also does not require exclusion *when the evidence is offered for another purpose,* such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

FED.R.EVID. 408 (emphasis added). The purpose behind Rule 408 is the promotion of "nonlitigious solutions to disputes." *Catullo v. Metzner,* 834 F.2d 1075, 1079–79 (1st Cir. 1987) (quoting *Reichenbach v. Smith,* 528 F.2d 1072, 1074 (5th Cir.1976)). To encourage compromise of disputes, statements made during the course of a settlement negotiation may not be introduced as evidence of liability or the absence of liability on an underlying claim. Such admissions may, however, be introduced for other purposes. *See, e.g., id.; United States v. Hauert,* 40 F.3d 197 (7th Cir.1994) (offered to show knowledge), *cert. denied,* —— U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995). Here,

the statements are not being offered to show that the debtor is or is not liable on the guarantee; in fact, the debtor does not contest his liability on the underlying debt. Rather, the statements are being used to demonstrate the debtor's *intent* to conceal assets from Marine. *See Catullo v. Metzner,* 834 F.2d at 1079 (reversing trial judge who excluded statements made during settlement negotiations which were offered to show intent of the parties to the ultimate settlement).

With that predicate issue resolved, we move on to the meat of the motion. A motion for summary judgment may only be granted where there is no genuine issue of material fact that is in dispute and a party is entitled to judgment as a matter of law. *Industri & Skipsbanken A/S v. Levy,* 183 B.R. 58, 61–62 (S.D.N.Y.1995) (citing Fed. R.Civ.P. 56(c)). The moving party bears the burden of showing that no genuine issue of material fact exists, *id.* (citing *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir. 1988)), and all reasonable inferences must be drawn and ambiguities resolved in favor of the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Brady,* 863 F.2d at 210. The court's function at this stage is not to assess the credibility of witnesses or affidavits, *see Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994), nor to weigh the evidence to determine the truth of the matter, but merely to determine whether a genuine issue remains to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

### A. Section 727(a)(2)(A)

#### 1. The First Claim for Relief

■ The first claim alleges that Portnoy ought be denied a discharge under section 727(a)(2)(A) of the Bankruptcy Code because, within one year of the petition date, he concealed his transfer of his weekly paychecks to his wife with the intent to hinder, delay or defraud Marine. Section 727(a)(2)(A) of the Bankruptcy Code provides in pertinent part:

(a) The court shall grant a debtor a discharge unless— . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred,. removed, destroyed, mutilated, or concealed—

(A) *property of the debtor,* within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A) (emphasis added).

*a. Whether any of Portnoy's salary could constitute his property*

Portnoy contends that he cannot be said to have concealed his salary because his salary was not his property under New York law. He argues that, as a matter of law, a debtor's transfer of his paycheck to his spouse cannot constitute a fraudulent transfer in New York, and that, therefore, it may not form the basis for concealment of property under section 727(a)(2)(A) either. For the former proposition he cites *In re Caplan's Estate,* 196 Misc. 631, 633, 92 N.Y.S.2d 369, 371 (Surrogate's Ct. N.Y. County 1949); *Power v. Loonam,* 49 Misc.2d 127, 266 N.Y.S.2d 865 (N.Y.Sup.Ct. Nassau County 1966); and *In re Edelman,* 172 F.Supp. 200 (E.D.N.Y.1959), and for the latter, *Bennett & Kahnweiler Assoc. v. Ratner (In re Ratner),* 132 B.R. 728 (N.D.Ill. 1991). Portnoy overstates the law on both counts.

The New York cases are based on those courts' interpretation of what is now section 5205 of New York's Civil Practice Law and Rules.[4] The section provides in relevant part:

The following property is exempt from application to the satisfaction of a money judgment, *except such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents:* . . .

2. ninety per cent of the earnings of the judgment debtor ·for his personal ser-

---

**4.** Notwithstanding the minor textual alterations and changes in section number, no change in

substance was intended. *See* 3rd Report Leg. Doc. (1959) No. 17, p. 112.

vices rendered within sixty days before, and at any time after, an income execution is delivered to the sheriff or a motion is made to secure the application of the judgment debtor's earnings to the satisfaction of the judgment. . . .

7B N.Y. CIV.PRAC. L. & R. § 5205(d)(2) (McKinney's 1978) (emphasis supplied).

Nowhere in this statute is there any exoneration of a debtor's intentionally fraudulent concealment of salary through a transfer to a spouse. Nor does the statute say that all of such transferred funds are no longer a debtor's property even if he maintains unfettered access to those funds for needs beyond that necessary for support. Rather, each of the cases interpreting the statute holds, in substance, that to the extent the debtor's transferred salary is used for necessary support of the debtor or the debtor's dependents, the transfer of such funds cannot be considered a fraud on creditors. For example, *In re Caplan's Estate* holds that:

> Since the fund in question would have been exempt in the hands of the decedent from seizure by judgment creditors, its transfer to debtor's wife for the very purpose of support mentioned in the statute granting the exemption cannot constitute a transfer of assets . . . in fraud of creditors.

*In re Caplan's Estate*, 196 Misc. at 633, 92 N.Y.S.2d at 371. Likewise, *Power v. Loonam* noted that the funds were identified by the debtor's wife as "funds intended to meet current living expenses," and absent any other evidence, the court vacated a previous restraint against the wife's use of her account "as least to the amount which is exempt under the statute." 49 Misc.2d at 129–130, 266 N.Y.S.2d at 867–68. *In re Edelman* held that where the trustee in bankruptcy failed to rebut the showing that the funds were necessary for the reasonable requirements of the debtor and his family, the referee was not in error for adjudicating the salary exempt. 172 F.Supp. 200 (E.D.N.Y.1959). *Edelman* quoted *Sverd v. Mostel*, 283 A.D.

128, 126 N.Y.S.2d 426, 429 (1st Dep't 1953) which said:

> The debtor, or a third party who seeks to rely for his protection on the exemption of the debtor's property in his hands[,] must satisfy the court of the necessity for the use of the funds for which he seeks the statutory exemption.

In sum, these cases do not stand for the blanket proposition which the debtor is advancing—that a 90% percent transfer of a debtor's salary to his spouse may *never* constitute a fraud on creditors. Rather, synthesizing the cases we see that the appropriate inquiry is the quantum necessary for the debtor's and his family's "reasonable requirements" for support, keeping in mind that "no man should be permitted to live at the same time in luxury and in debt." *In re Chusid's Estate*, 60 Misc.2d 462, 463, 301 N.Y.S.2d 766, 770 (Surrogate's Ct. Kings County 1969).

What this all means in the context of this motion is that Portnoy cannot be granted summary judgment, having failed to establish by uncontroverted facts that all of his salary is necessary for the support of himself and his wife. *See Sverd v. Mostel, supra,* 126 N.Y.S.2d at 429; *see, e.g.,* 6 WEINSTEIN-KORN-MILLER, N.Y. CIV.PRAC. ¶ 5205.24.[5] Significantly, Portnoy has not even contended that 90% of his $150,000 plus annual salary was necessary to support himself and his wife, his only dependents. *Cf.* Ex. "16," *Marine Midland Bank v. Portnoy,* No. 11286/95, slip op. at 3. And since Portnoy began transferring his salary to his wife she has amassed some $200,000 even though she earned only $19,000 a year and had no other significant income. Ex. "16," *Marine Midland Bank v. Portnoy,* No. 11286/90, slip op. at 4 (Sept. 8, 1995); Ex. "7," Mrs. Portnoy's Dep. at 20—27, 36—40 (Oct. 5, 1995).

Portnoy makes much of the fact that the state court in Marine's fraudulent conveyance action had earlier vacated a temporary restraint against Mrs. Portnoy's use of her account. Portnoy repeatedly cites a single line from that decision: "Moreover, plaintiff's

---

**5.** The 90% exemption of income is not absolute— if the court determines that not all of the 90% is necessary for the reasonable requirements of the judgment debtor and his family, it can invade the 90%. *See* N.Y. CIV.PRAC. L. & R. § 5205 practice commentaries. "The expedient for accomplishing this is an installment payment order under CPLR 5226, and it is to that device that the judgment creditor should direct attention when such a situation is at hand." *Id.*

right to its 10% share of Larry's paycheck is adequately protected by the garnishment order (CPLR) 5205(d)." Ex. "6," *Marine Midland Bank v. Portnoy*, 104830/90, slip op. at 10 (Sup.Ct. N.Y. County, May 8, 1995) (Davis, J). However, Portnoy neglected to quote the basis of the court's decision, which preceded the quoted statement: "At this juncture there is no showing of exigent circumstances which would require a court to enjoin Arlene's personal accounts. Plaintiff does not state that Arlene is about to transfer assets." *Id.* at 10.

Moreover, the state court appeared to credit Mrs. Portnoy's testimony during which she swore that "these accounts and the assets and sources therefor do not represent fraudulent conveyances from Larry, but represent the savings of a housewife and worker over many years preceding my marriage to Larry." *Marine Midland Bank v. Portnoy*, 104830/90, slip op. at 3. To refute this, Marine has now come forth with evidence which sufficiently raises the inference that Mrs. Portnoy may not have been entirely truthful in her testimony before the state court. *See* Ex. "7," Arlene Portnoy Dep. at 20, 23, 24, 36–40 (Oct. 5, 1995). Portnoy has chosen to simply ignore the issue and rely instead on the isolated quotation from the state court's decision. Portnoy also apparently forgets the state court's later determination pursuant to CPLR section 5226, in which the court concluded that approximately $1,250 per week (in addition to the 10% garnishment) was unnecessary for support. Ex. "16," *Marine Midland Bank v. Portnoy*, No. 11286/95, slip op. at 6 (basing that decision on consideration of all Portnoy's income sources, including the trust).

In short, Portnoy has not demonstrated that, as a matter of law, his paychecks are exempt from execution and are therefore not property of his estate. Marine's submissions could support a finding that not all of Portnoy's $150,000 plus salary was necessary for the reasonable requirements of the debtor and his wife. Thus, the secret transfer of the whole salary may be found to have been a fraud on creditors without violating the spirit of CPLR § 5205.

Portnoy can derive no greater comfort from the bankruptcy cases which he cites than he does from the New York cases. He points to *In re Ratner*, 132 B.R. 728 (N.D.Ill. 1991), for the proposition that a chapter 7 debtor's practice of depositing funds into his wife's account does not warrant a denial of discharge under section 727(a)(2)(A). However, the court expressly noted that "the question of a debtor's intent under § 727 of the Code is a question of fact" and, *after trial*, the court found that the plaintiff did not meet his burden of demonstrating intent. *Id.* at 731. The allegations were not disposed of by summary judgment. *Rosen v. Bezner*, 996 F.2d 1527 (3d Cir.1993), *reversed* an order awarding summary judgment on precisely the issue of the debtor's intent to continuously conceal property under section 727. (Only in *Rosen*, the trial court had granted summary judgment against the debtor).

### b. Whether Portnoy engaged in concealment

Having rejected the debtor's contention that as a matter of law I must find that his entire salary was not his property, we turn to the law of concealment.

■ Concealment may be accomplished by a transfer of title coupled with the retention of the benefits of ownership. *See, e.g.,* 4 L. KING, COLLIER ON BANKRUPTCY ¶ 727–.02[6][b] at 727–31 through 727–32 & n. 87 (15th ed. 1994); *EFA Acceptance Corp. v. Cadarette (In re Cadarette)*, 601 F.2d 648 (2d Cir.1979); *In re Ulrich*, 18 F.Supp. 919, 920 (S.D.N.Y. 1937), *aff'd without opinion*, 95 F.2d 1018 (2d Cir.1938). Here, Marine has alleged that notwithstanding Portnoy's transfer of his salary to his wife during the one year period before bankruptcy, he maintained all of the benefits of ownership of the funds. As Marine emphasizes, Portnoy exercised exclusive check writing privileges over the account notwithstanding the fact that the account was in Mrs. Portnoy's name.

■ Concealment of property is also evidenced by the debtor's "placing assets beyond the reach of creditors or withholding knowledge thereof by fail[ing] or refus[ing] to divulge owed information." 4 L. KING,

COLLIER ON BANKRUPTCY ¶ 727.02[6][b] at 727–30 (15th ed. 1994) (citing *Continental Bank & Trust Co. v. Winter*, 153 F.2d 397 (2d Cir.), *cert. denied*, 329 U.S. 717, 67 S.Ct. 49, 91 L.Ed. 622 (1946)). Mere failure to volunteer information to a creditor is insufficient, however, to constitute concealment. *Continental Bank & Trust Co. v. Winter*, 153 F.2d 397 (2d Cir.), *cert. denied*, 329 U.S. 717, 67 S.Ct. 49, 91 L.Ed. 622 (1946). Here, Marine submits that during the course of settlement negotiations, it was misled by Portnoy into believing that all of Portnoy's assets were used up for cancer treatments, notwithstanding his actual transfer of those assets to the offshore trust. It is also undisputed that Portnoy lied about his income. In addition, Marine has elicited testimony from Portnoy that he knew full well in June 1989 that Mary Drawers was shortly to be liquidated, Ex. "3," Debtor's Dep. at 21–22, 80–84. Presumably, he therefore recognized that his guarantee would be called.

Even if, as Portnoy contends, he had no duty to speak in this particular case, once he opened his mouth to set forth the facts, he thereby gave life to a duty to tell the truth. *See Ackerman v. Schwartz*, 947 F.2d 841, 847–48 (7th Cir.1991) ("the lack of an independent duty does not excuse a material lie"); *Schlansky v. United Merchants & Manufacturers, Inc.*, 443 F.Supp. 1054 (S.D.N.Y.1977) (If a voluntary representation is uttered, a duty arises as to its accuracy and truth, along with a concomitant obligation to avoid negligent omissions following thereafter.) (citing *Gediman v. Anheuser Busch, Inc.*, 299 F.2d 537, 546 (2d Cir.1962)). Accordingly, the facts suggest that Marine may be able to establish concealment.

#### c. Whether Portnoy intended to hinder, delay or defraud Marine

The issue whether Portnoy concealed this property with the requisite intent to hinder, delay, or defraud Marine is disputed. Portnoy explains that the transfer of his weekly paycheck to his wife since 1990 and his transfer of a joint interest in his home were not intended to hinder Marine but were made in response to demands from his wife and in order to preserve their marriage. Although Portnoy's intent is plainly an issue of fact which precludes summary judgment, Marine annexes a copy of Mrs. Portnoy's deposition during which she testified that she did not demand that Portnoy transfer his salary to her, but only that she be permitted check writing privileges. Marine also points out that Portnoy's explanation does not answer the question why previously he had transferred his checks to his daughter, if not to hinder Marine. The facts are strongly suggestive of the incredibility of the debtor's view. Nevertheless, Marine has not itself moved for summary judgment and I am not going to reach out to grant it. *See Rosen v. Bezner*, 996 F.2d 1527.

#### 2. The Second Claim for Relief

█ The second claim is based on the "continuous concealment doctrine." The complaint alleges that the debtor transferred substantially all of his assets to an offshore trust *before* one year prior to the petition date but remained *de facto* owner by continuing to maintain unlimited control over the assets and conceal the trust within one year of the petition date.[6]

█ "[A] concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before the one year period as long as the debtor allowed the property to remain concealed into the critical year." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993) (citing *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 555 (5th Cir.1987)); *March v. Sanders (In re Sanders)*, 128 B.R. 963, 969–70 (Bankr.W.D.La.1991) (citing, e.g., *In re Kaiser*, 722 F.2d 1574 (2d Cir.1983); *In re Walter*, 67 F.Supp. 925 (S.D.N.Y.1946)); 4 L. KING, COLLIER ON BANKRUPTCY ¶ 727.02[2] at 727–12 (15th ed. 1994). This "continuing concealment" of property will be found to bar the debtor's discharge when he continued to conceal the existence of the property with

---

**6.** This claim also encompasses the concealment of Portnoy's paychecks to his wife outside the one year period before bankruptcy. Because the transfers continued into that year, it is unnecessary to invoke the continuous concealment doctrine as to this portion of the claim.

the intent to hinder, delay, or defraud a creditor. *Id.; Congress Talcott Corp. v. Sicari (In re Sicari),* 187 B.R. 861, 875 (Bankr. S.D.N.Y.1994). As the debtor points out, the relevant inquiry for establishing a concealment under section 727(a)(2) is whether the debtor concealed *his* property and not whether the debtor concealed a previous transfer made outside the one year period before bankruptcy. *See Rosen,* 996 F.2d at 1531–32; *Thompson v. Eck,* 149 F.2d 631 (2d Cir.1945) (noting that "the bankrupt must have some legal interest in the property before he can be charged with its concealment.").

▮▮▮ While the issue of control over the trust assets appears to be an issue of law, the debtor vehemently contends that I lack jurisdiction to make that determination. Moreover, he contends that the declaration of trust ought be interpreted under Jersey law, as the trust so provides. Frankly, I do not see how I could lack jurisdiction to determine whether Portnoy retained significant control over the trust assets for purposes of concealment under section 727(a)(2) of the Bankruptcy Code. Although one might question whether I have jurisdiction over the trust itself, that is not terribly relevant, for what is sought is not the enforcement of some right under the trust, but, rather, a determination of whether by concealing his interest in that trust the debtor thereby forfeited his right to a discharge in bankruptcy. Quite plainly, I have jurisdiction to determine whether a voluntary debtor is entitled to the bankruptcy discharge for which he has petitioned regardless of whether or not the property which he is said to have concealed is within my jurisdiction. *See* 28 U.S.C. § 157(b)(2)(J).

▮▮▮ So we turn to the issue of whether the debtor concealed a property interest in the trust. Congress has generally left the determination of property rights in the assets of a debtor's estate to state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (Act case). Whereas property interests are created and defined by state law, *id.* at 55, 99 S.Ct. at 918, it is federal bankruptcy law which determines the outer boundary of what may constitute property of the estate pursuant to section 541 of the Bankruptcy Code. *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1101 (2d Cir.1990). Having recognized that local law determines whether Portnoy retained an interest in the offshore trust, I must still determine which local law will supply the substantive rule. *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 350 (2d Cir.1992). There are two possibilities here for the rule of substantive law, that of New York and that of Jersey.[7] Portnoy contends that it is this latter jurisdiction's law which must be applied given the language in the offshore trust that it is to be interpreted under Jersey law. Both jurisdictions have an interest in this litigation. On the one hand, Portnoy is a United States domiciliary who transferred all of his personal property[8] to an offshore trust at a time when he knew that his guarantee to a New York bank of the debts of his New York company would soon be called. In addition, Portnoy seeks to distribute his nonexempt property, which is determined by domestic law, to his creditors and in return receive a bankruptcy discharge. On the other hand, Jersey has an interest in determin-

7. The parties have assumed that either New York or the Jersey Channel Islands' law applies to this adversary proceeding, despite the fact that Portnoy lives in the State of New Jersey. However, Portnoy has argued New York law and has not contended that New Jersey law applies to this adversary proceeding; he has therefore waived the argument. I need not raise the issue *sua sponte. See Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 832 (2d Cir.1994); *Vitol Trading S.A., Inc. v. SGS Control Servs., Inc.,* 680 F.Supp. 559, 566 n. 2 (S.D.N.Y.1987), *rev'd on other grounds,* 874 F.2d 76 (2d Cir.1989); *Martin v.*

*City of Cohoes,* 37 N.Y.2d 162, 165–66, 332 N.E.2d 867, 869, 371 N.Y.S.2d 687, 690 (1975); *see also Marine Midland Bank v. Portnoy,* No. 11286/95, slip op. 6 (Sup.Ct. N.Y. County Sept. 8, 1995) (applying New York law as to the dispute between the instant parties).

8. Marine also submits that Portnoy transferred real property to the offshore trust, though none of the trust forms reflect such holdings. In any event, this issue may await the trial on the merits.

ing what rights remain in the settlor of a trust under its law.[9]

Many bankruptcy courts have borrowed from the law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law. *See Koreag,* 961 F.2d at 350 (citing cases). On the other hand, federal principles should guide consideration of which jurisdiction's substantive law applies in cases arising out of federal law. *Id.* (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981)). Ordinarily, I would have to characterize this action to deny a discharge as either predominantly founded upon state-created rights or involving important concerns implicating national bankruptcy policy. *Id.*

■ Untangling the intermeshed features of state and federal law is unnecessary in this case, however, because the choice of law rules of the forum, New York, and under federal common law yield the same result. The federal common law choice of law rule is to apply the law of the jurisdiction having the greatest interest in the litigation.[10] *Koreag,* 961 F.2d at 350; *In re Best Products Co.,* 168 B.R. 35, 51 (Bankr.S.D.N.Y.1994), *appeal dismissed as moot,* 177 B.R. 791 (S.D.N.Y.), *dismissal vacated and ruling of bankruptcy court affirmed,* 68 F.3d 26 (2d Cir.1995). New York law similarly provides that "the law of the jurisdiction having the greatest interest in the litigation will be applied, and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Istim, Inc. v. Chemical Bank,* 78 N.Y.2d 342, 347, 581 N.E.2d 1042, 1044, 575 N.Y.S.2d 796, 798 (1991) (internal quotations omitted); *see Wells Fargo Asia Ltd. v. Citibank, N.A.,* 936

F.2d 723, 726–27 (2d Cir.1991), *cert. denied,* 505 U.S. 1204, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992).

Both federal and New York choice of law principles generally respect a designation in a trust which provides that a certain law be applied to interpret it. *See In re New York Trust Co.,* 195 Misc. 598, 87 N.Y.S.2d 787 (1949); *see also* 5A AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 575 at 201 (Little, Brown & Company 4th ed. 1987) (referred to as "SCOTT ON TRUSTS"). For the most part, it is immaterial whether the forum designated for purposes of *construing* the trust provisions has any connection with the creation or the administration of the trust. 5A SCOTT ON TRUSTS, *supra,* § 575 at 201–202. Nonetheless, for purposes of determining the *validity* of a trust, the settlor has "not as free a hand." *Id.* The Restatement (Second) of Conflicts of Laws notes:

> The chief purpose in making decisions as to the applicable law is to carry out the intention of the creator of the trust in the disposal of his property. It is important that his intention, to the extent to which it can be ascertained, should not be defeated, unless this is required by the policy of a state which has such an interest in defeating his intention, as to the particular issue involved, that its local law should be applied.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 267 at 131 (1971); *see also* 5A SCOTT ON TRUSTS, *supra,* § 553 at 110–111 ("In the making of a contract, the conflicting interests of two or more parties are involved, whereas in the creation of a trust the intention of the settlor or testator is the only important consideration, except insofar as some public policy may defeat his intention."). As to a trust's validity, the Restatement provides:

---

9. However, as Portnoy admits, Jersey does not claim to have exclusive jurisdiction over its trusts. *See* Article 5 of the Trust Law 1984. Portnoy bases his argument that jurisdiction is vested exclusively in the Jersey courts on the terms of his trust declaration itself. To whatever extent that may be binding on Portnoy and the trustee, it certainly cannot bind Portnoy's creditors.

10. This analysis is basically the same one contained in section 403 of the Restatement (Third) of Foreign Relations Law of the United States (1987). There, the analysis is grounded in "reasonableness" and the court is to focus on locating the jurisdiction whose laws and policies are the most involved with the controversy. *See Maxwell Communication Corporation plc v. Societe Generale plc (In re Maxwell Communication Corporation),* 186 B.R. 807, 822 n. 11 (S.D.N.Y. 1995), *aff'd,* 93 F.3d 1036 (2d Cir.1996).

An inter vivos trust of interests in movables is valid if valid

> (a) under the local law of the state designated by the settlor to govern the validity of the trust, provided that this state has a substantial relation to the trust and the application of its law does not violate a strong public policy of the state with which, as to the matter at issue, the trust has its most significant relationship ...

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 270 at 163, 164.

■ That Portnoy settled the trust in Jersey, designated the trust to be administered in Jersey, and appointed a Jersey resident as trustee, gives Jersey an undeniable relationship to the trust. On the other hand, Portnoy, who is both the settlor and primary beneficiary, Portnoy's creditors, and the other beneficiaries are all United States domiciliaries.[11] Portnoy's creditors have no contacts with Jersey, and Portnoy had the greatest contact with the United States at the time he settled the trust and reasonably could have believed that United States law would be applicable, *see First Nat'l Bank of Mount Dora v. Shawmut Bank,* 378 Mass. 137, 147, 389 N.E.2d 1002, 1008 (1979) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 268(2) (1971); 5A SCOTT ON TRUSTS § 576 (Supp. 1979)); *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.),* 108 B.R. 384, 385–86 (Bankr.D.Mass.1989). On balance, I conclude that New York has the weightier concern in determining whether or not whatever rights Portnoy retained after he formed the trust could be considered to constitute a property interest such that that interest should have been disclosed in his bankruptcy schedules. The trust, the beneficiaries, and the ramifications of Portnoy's assets being

transferred into trust have their most significant impact in the United States. In addition, I believe that application of Jersey's substantive law would offend strong New York and federal bankruptcy policies if it were applied, as I will explain.[12]

■ In order to put the discussion into context, I will begin with New York law on the subject. Under New York law:

> 'when a person creates for his own benefit a discretionary trust, his creditors can reach the maximum amount which the trustee under the terms of the trust *could* pay to him or apply for his benefit, even though the trustee in the exercise of his discretion wished to pay nothing to the beneficiary or to his creditors, and even though the beneficiary could not compel the trustee to pay him anything,' *(Vanderbilt [Credit Corp. v. Chase Manhattan Bank, N.A.],* 100 A.D.2d [544] at 545, 546, [473 N.Y.S.2d 242, 245 (2d Dep't 1984); RESTATEMENT (SECOND) OF TRUSTS § 156 (1959) ]). In addition, it is irrelevant that the settlor was solvent [at] the time of the creation of the trust and did not intend to defraud creditors for '[i]t is against public policy to permit the settlor-beneficiary to tie up her own property in such a way that she can still enjoy it but can prevent her creditors form [sic] reaching it' *(id.; cf. Herzog v. CIR,* 116 F.2d 591 (2d Cir. [1941] )).

The creditor's right to invade the trust corpus to satisfy a judgment is determined by the wording of the declaration. For example, a judgment creditor may reach the corpus of the trust if the trust agreement grants the trustee the power to invade the corpus and pay the entire principal to the settlor *(Vanderbilt, supra; State*

---

11. It is not clear at this juncture where the assets are being held—in the United States or Jersey. *See* Elizabeth R. Turner, et al., *Asset Protection Techniques,* C992 ALI/ABA 1, 43 (Feb. 23, 1995) (asserting that bankruptcy judge can issue a continuing turnover order so that if the assignee of the debtor's rights can ever catch the debtor or any distributee with trust assets in the United States, the creditor can reach such assets).

12. This is not to suggest that Jersey would unquestionably apply its own substantive law. For Jersey too has its own conflict of law rules which

in some instances point to the application of United States' law. For example, the general Jersey conflicts of law rule is that the capacity of a settlor to dispose of the personal property needed to create the trust is governed not by the trust's designated law but where the settlor is domiciled. *See Paul Matthews & Terry Sowden QC, The Jersey Law of Trusts* 44–45 (Key Haven Publication plc 3d ed. 1993). The law of the settlor's domicile also governs whether a particular transaction involving movable property is forbidden by law. *Id.* at 53.

of New York v. Coyle, 171 A.D.2d 288 [575 N.Y.S.2d 975 (A.D.3d Dep't 1991] )).[13]

Ex. "6," *Marine Midland Bank v. Portnoy*, No. 104830/95, slip op. at 13 (Sup.Ct. N.Y. County May 8, 1995); *see In re de Kleinman*, 172 B.R. 764, 772–73 (Bankr.S.D.N.Y.1994); N.Y. ESTATE POWERS & TRUST LAW § 7–3.1(a) (McKinney's 1992).

Portnoy has admitted that Jarden "has the broadest discretion possible with respect to the accumulation of income, distribution of income, and invasion of principal [sic]," a discretion which unequivocally permits payment of some or all of the trust assets to Portnoy himself. *See* Debtor's Aff. in Supp. ¶ 11 at 4. It cannot be legitimately disputed then that Portnoy has a property interest in the trust assets under New York law.

Under prior Jersey law the rule was that a gift into trust of the donor's assets was disregarded as fraudulent vis-à-vis his creditors where the settlor retained the power freely to dispose of the assets given by him into trust. *See Abdel Rahman v. Chase Bank (C.I.) Trust Company Limited*, 1991 J.L.R. 103, 125 (1991). The *Abdel* court engaged in a lengthy discussion of the maxim *donner et retenir ne vaut rien* and held that its purpose "is to protect the rights of succession of heirs, to protect creditors and to prevent frauds." The maxim, *donner et retenir ne vaut rien*, roughly translated to English means "giving and retaining is not worth anything," and encapsulates the idea that that person cannot give away property and at the same time retain it, *see Paul Matthews & Terry Sowden QC, The Jersey Law of Trusts* 59 (Key Haven Publication plc 3d ed. 1993). In other words, Jersey recognized that effective retention of the use of the trust corpus means that the property has not been parted with. *Id.* Were that the law today, then application of Jersey law to determine whether Portnoy retained a secret property interest in the offshore trust would probably

not offend any policy of New York or of federal bankruptcy law. The rub is that the law applied in *Abdel Rahman* was legislatively overruled in Jersey with the enactment of Trust (Amendment) (Jersey) Law, 1989. *See Abdel Rahman*, 1991 J.L.R. at 146 (noting that the trust which it was there holding invalid was created long before the Trusts (Amendment No. 1) (Jersey) Law, 1989 was enacted).

The amendment made in early 1989 abolished the maxim that was used to nullify the trust in *Abdel Rahman*; the law now declares that "Nothing in the terms of a trust shall cause a transfer or disposition of property to a trust to be invalidated by application of the rule, *'donner et retenir ne vaut.'* " Trust (Amendment) (Jersey) Law, 1989. As one commentator has said, for dispositions taking effect on or after July 21, 1989, the question of whether the donor retained the power to freely dispose of property already given by him *inter vivos* or where he remains in possession of it "is purely academic." *Matthews & Sowden QC, The Jersey Law of Trusts, supra*, at 59 (citations omitted). "Nor will [the trust] be affected if the trust is expressed to be revocable at the will of the settlor." *Id.* at 65. Here, Portnoy settled the offshore trust in August 1989, after the Jersey amendment became effective.

■ Whereas under normal circumstances parties are free to designate what state's or nation's law will govern their rights and duties, where another state or nation has a dominant interest in the transaction at issue, and the designated law offends a fundamental policy of that dominant state, the court may refuse to apply the foreign law. *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp.*, 805 F.Supp. 133, 141 (W.D.N.Y.1992) (citing *Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 394 (8th Cir.1986)).

**13.** The predecessor statute to N.Y. Estate Powers and Trust Law § 7–3.1, Personal Property Law § 34, avoided only transfers which were wholly for the use of the grantor; it did not apply to transfers made for other objects, but which contained a residuary incidental or partial reservation of interest for the transferor. *See Liberty Storage & Warehouse Co. v. Van Wyck*, 256 A.D. 641, 11 N.Y.S.2d 92, 93 (1939); *In re Bourne's Will*, 4 Misc.2d 610, 158 N.Y.S.2d 1009 (1957). Here, however, it is clear that the trustee may appoint the whole of the trust and its income to the "Principal Beneficiary"—Portnoy—who himself retains the exclusive power to dismiss the trustee and appoint another, thus rendering the result the same under the current and old law.

In making a determination, on the basis of public policy, whether to enforce a foreign statute, the issue is not whether the foreign statute reflects a different public policy from that of the forum, but rather whether enforcement of the particular agreement would represent an affront to the public policy of the forum. Thus, to render foreign law unenforceable as contrary to public policy, it must violate some fundamental principle of justice, some prevalent conception of good morals, or some deep-rooted tradition of the common weal.

19 N.Y. JUR.2D *Conflict of Laws* § 14 at 586–87 (1982). Generally speaking, the public policy is to be found in the state's constitution, its statutes and the decisions and settled rules of the courts. *Id.* I think it probably goes without saying that it would offend our policies to permit a debtor to shield from creditors all of his assets because ownership is technically held in a self-settled trust, where the settlor/beneficiary nonetheless retains control over the assets and may effectively direct disposition of those assets. Nonetheless, I shall briefly outline the policies underpinning American law.

In the United States, it has long been held that "[i]t is against public policy to permit the owner of property to create for his own benefit an interest in that property that cannot be reached by his creditors." 2A SCOTT ON TRUSTS, *supra*, § 156 at 168. "This policy finds it roots in an English statute of 1487, prescribing that '[a]ll deeds of gift of goods and chattels, made or to be made in trust to the use of that person or persons that made the same deed or gift, be void and of none (sic) effect.' " Elena Marty–Nelson, *Offshore Asset Protection Trusts: Having Your Cake and Eating it Too*, 47 RUTGERS L. REV. 11, 12 (Fall 1994) (quoting 3 Hen., 7, ch. 4 (1487) (Eng.)).

On the other hand, it is not at all clear what the policy behind the Jersey amendment is except, perhaps, to augment business. *See* Marty–Nelson, *Offshore Asset Protection Trusts, supra*, at 58 & n. 229; *see also Finnish Fur Sales Co., Ltd. v. Juliette Shulof Furs, Inc.*, 770 F.Supp. 139, 143–44 (S.D.N.Y.1991) (noting that in the case of a conflict, New York's policy will not invariably prevail in the face of a strong assertion of interest by the foreign jurisdiction); *Vladikavkazsky Ry. Co. v. New York Trust Co.*, 263 N.Y. 369, 378–79, 189 N.E. 456, 460 (1934) (confiscation decree was so contrary to New York's public policy that absent more compelling foreign countervailing policy, New York law applied), *r'hrg denied*, 264 N.Y. 595, 191 N.E. 581 (1934). Portnoy's trust is not a unique phenomenon, but a variant of what in the domestic context is called a spendthrift trust. This offshore variant is commonly referred to as an "offshore asset protection trust ("OAPT")." *See* Marty–Nelson, *Offshore Asset Protection Trusts, supra*. The OAPTs offer far more protection to the settlor than their U.S. counterparts because they enable a settlor/beneficiary to control and benefit from the property and at the same time shield it from creditors. *Id.* at 15. In the United States, "state laws uniformly outlaw self-settled spendthrift trusts," *id.* at 15, 29–30 & n. 95, 31 & n. 104, and "[a] conveyance whether absolute or in trust is ineffective if the transferor does not surrender control over the property," 2A SCOTT ON TRUSTS, *supra*, § 37 at 401.

Based on New York's deep-rooted policies and absent a more compelling countervailing Jersey policy, New York law applies to the determination of whether Portnoy retained a property interest in the assets of the offshore trust for the purposes of determining whether he is entitled to the bankruptcy discharge for which he has petitioned. Whereas it is not necessary in this instance to examine the particular powers reserved to Portnoy in the declaration of trust because New York law would hold the assets of a self-settled discretionary trust to be the settlor's, I do feel compelled to comment on some of the provisions. Portnoy makes much of the fact that distribution of corpus and principal is within the absolute discretion of the trustee, notwithstanding his exclusive power to advise the trustee. Portnoy downplays this power by pointing to the trustee's fiduciary duties to the other beneficiaries (which, by the way, Jarden can ignore for no reason at all under the terms of the trust). Jarden's fidelity to Portnoy is plainly apparent, for during the course of this very motion, Portnoy success-

fully directed the trustee to pay from the assets of the trust for a legal analysis of Jersey law for the sole purpose of determining whether Portnoy would be entitled to a bankruptcy discharge under United States law. *See* Letter of Elliot I. Miller to Jarden Morgan Trustees (Jersey) Ltd. (Aug. 20, 1996); Letter of Jarden Morgan Trustees (Jersey) Ltd to Elliot I. Miller (Aug. 21, 1996). If Portnoy is only a mere beneficiary as he so emphatically contends, why are the trust and other beneficiaries blindly footing the costs of issues arising in his personal United States bankruptcy case?

In addition there is a second basis upon which to apply New York law—a choice of law provision "will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lien-holders." *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp.*, 805 F.Supp. 133, 140 (W.D.N.Y.1992) (citing *Broadcasting Rights Int'l Corp. v. Societe du Tour de France*, 675 F.Supp. 1439, 1448 (S.D.N.Y.1987)); *Carlson v. Tandy Computer Leasing*, 803 F.2d 391 (8th Cir.1986); *Ferrari v. Barclays Business Credit (In re Morse Tool, Inc.)*, 108 B.R. 384, 386 (Bankr. D.Mass.1989) (refusing to follow choice of law provision in trust, holding that it was ineffective to bind creditors). Here, the only person that is party to this choice of law provision is Portnoy himself. Portnoy may not unilaterally remove the characterization of property as his simply by incorporating a favorable choice of law provision into a self-settled trust of which he is the primary beneficiary. Equity would not countenance such a practice. *Cf. Peoples Bank of Charles Town v. Colburn, III (In re Colburn, III)*, 145 B.R. 851 (Bankr.E.D.Va.1992) (denying debtor a discharge for his failure to list reversionary interest in an offshore trust on his bankruptcy schedules).

▮ Under the Bankruptcy Code, all property "wherever located and by whomever held" in which the debtor has a legal or equitable interest becomes property of the bankruptcy estate, 11 U.S.C. § 541(a). As the legislative history demonstrates, the sweep of this section was intended to be quite broad. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). I have already determined that Portnoy's assets remain his, notwithstanding their transfer to the trust. If Portnoy contends that section 541(c)(2) of the Bankruptcy Code [14] would provide him any relief, he is wrong, for under settled New York law, when a person creates a discretionary trust for his own benefit, his creditors can receive the maximum amount which the trustee under the terms of the trust could pay out to him even though the trustee in the exercise of his discretion wishes to pay the settlor/beneficiary nothing. *Vanderbilt*, 100 A.D.2d at 546, 473 N.Y.S.2d at 245–46.

That being decided, the only remaining issue is the debtor's intent. Clear issues of fact exist as to the intent of the debtor in transferring the assets to the offshore trust and whether that intent continued into the one-year prepetition period; thus summary judgment is not warranted. It may well be that if the disputed factual issues are resolved in Marine's favor, it will be entitled to judgment. *See Rosen v. Bezner*, 996 F.2d 1527, 1532–33 (3d Cir.1993).

**B. Section 727(a)(4)**

▮ The third and fourth claims relate to Portnoy's alleged knowledge of his "control

---

**14.** The section provides:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives and option to effect a forfeiture, modification, or termination of the debtor's interest in property.
(2) *A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.*
11 U.S.C. § 541(c) (emphasis supplied). To the extent that the beneficial interest may be reached under New York law, it will constitute property of the estate.

powers" or his reckless failure to identify them on his bankruptcy schedules. Section 727 provides:

> (a) The court shall grant the debtor a discharge, unless ... (4) the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account.

11 U.S.C. § 727(a)(4).

In his summary judgment motion, the debtor contends that there is no issue of material fact because he does not have any "control powers." I have already determined that Portnoy retained sufficient control over the assets to have them constitute his property under section 541 of the Bankruptcy Code and an issue of fact remains as to whether his failure to list such assets was knowing or reckless, precluding summary judgment. *See In re Sicari*, 187 B.R. 861.

### C. Section 523(a)(6)

■■■■ Marine challenges not only Portnoy's right to a discharge but also his right to discharge Marine's judgment even if he would otherwise be entitled to a discharge. Portnoy seeks summary judgment on this claim under section 523(a)(6). This section provides in pertinent part, "A discharge ... does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 523(a)(6) includes willful and malicious economic injury to an entity. *Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr.S.D.N.Y. 1994), *aff'd without opinion*, (S.D.N.Y.), *aff'd*, 94 F.3d 84 (2d Cir.1996). There are two distinct components under subsection (a)(6)—intent and malice. The debtor must have engaged in (1) voluntary or deliberate conduct which was (2) targeted to cause the creditor injury. *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 880 (8th Cir.1985). Conduct that is merely negligent or reckless is not malicious, Senate Report No. 97–139, 97th Cong., 1st Sess. 523 (1981), and knowledge that legal rights are being violated is insufficient to establish malice, absent aggravated circumstances. *In re Zinke*, 174 B.R. at 1022;

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Said another way, there must be intent to cause injury rather than merely an intentional act which causes injury. *In re Long*, 774 F.2d at 880 (quoting *In re Cecchini*, 37 B.R. 671, 675 (9th Cir. BAP 1984)).

Courts routinely look to the facts to see if the circumstances are sufficiently egregious to constitute malice. *See In re Stelluti*, 167 B.R. 29; *In re Zinke*, 174 B.R. 1017, 1022 (Bankr.D.N.D.1994). Here, the issue of the debtor's true intent is disputed, and Marine has come forward with reasonable evidence sufficient to raise an inference that the debtor maliciously intended to injure Marine. Therefore, an issue of material fact exists and summary judgment in the debtor's favor is not warranted.

### CONCLUSION

In his motion for summary judgment, Portnoy contends that he disclosed to Marine his practice of transferring his paycheck to his wife and the existence of the offshore trust approximately ten months before the petition date. Further, he argues that his transfer of his salary was permissible under New York law and intended to "save his marriage" rather than to hinder or delay. He also contends that, although he did not disclose the existence of the offshore trust, there is no issue of fact because he filed Annual Foreign Trust Returns which, with due diligence, would have been discovered by Marine.

In opposition, Marine submits a declaration from its vice president in which Mr. Northington details an alleged history of intentional conduct by Portnoy designed to stave off Marine's ability to collect from him on his guarantee. The evidence and allegations contained in the declaration and supporting exhibits raise an inference that Portnoy intended to hinder Marine's collections efforts at the time he made the statements regarding his ability to pay. Marine's submissions also raise an inference that Portnoy secretly retained the benefits of ownership of seemingly transferred property with the intent to hinder creditors. This intent may have continued into the prepetition period.

The powers awarded him in the declaration of trust, coupled with the other allegations of intent, also raise an inference that Portnoy may have knowingly or recklessly made a false oath in connection with the case. On this motion, all reasonable inferences must be drawn in favor of Marine. If all that Marine asserts be true, Portnoy could be found to have intentionally hindered Marine's ability to collect on its guarantee within one year of the filing. He could also be found to have maliciously intended to injure Marine and to have fraudulently omitted property from his schedules.

Although the debtor urges that there is no genuine issue of material fact, it is clear that his knowledge and intent regarding his transfer of assets is central. *See* Marine's Memo. of Law in Opp'n at 14–28 (outlining the *Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582–1583 (2d Cir.1983) "badges of fraud" and reasonably asserting that Portnoy's actions have earned him every one). His alleged benevolent intent to save his marriage in the face of Marine's evidence that Portnoy made these transfers with the intent to defraud is an issue of fact not properly resolved on a motion for summary judgment; Portnoy's interpretation of New York law is also misguided. Portnoy's contention that he fully disclosed his practices ten months before the petition date ignores the other two months of the year before the filing. *Cf. Najjar v. Kablaoui (In re Kablaoui),* 196 B.R. 705, 708–09 (Bankr. S.D.N.Y.1996). Portnoy's contention that with due diligence, Marine would have discovered the trust is not relevant now. Marine claims that Portnoy did not earlier turn over the governmental forms to either Marine or the Mary Drawers' trustee, although the documents demanded would have included the trust forms. Beside the fact that Marine disputes the debtor's contentions and claims that the Trust Returns were not available to the public, Marine is not now expected to meet its burden of proof; it need only show that the debtor's version of the material facts is legitimately disputed. Marine has overcome that burden.

Based on the foregoing, the debtor's motion for summary judgment is denied. It is SO ORDERED.