In re Stephan Jay **LAWRENCE**, Debtor.

Alan L. **GOLDBERG**, Chapter 7 Trustee for the bankruptcy estate of Stephan Jay Lawrence, Plaintiff,

v.

Stephan Jay **LAWRENCE**, Defendant.

Bankruptcy No. 97–14687–BKC–AJC. Adversary No. 98–1211–BKC–AJC–A.

United States Bankruptcy Court, S.D. Florida, Miami Division.

Sept. 23, 1998.

Paul Steven Singerman, James H. Fierberg, Berger, Davis & Singerman, Miami, FL, for Plaintiff.

Robert A. Stok, Rosenthal, Rosenthal, Rasco, Stok & Wolf, Aventura, FL, for Defendant.

## ORDER GRANTING RELIEF REQUESTED IN SUPPLEMENT TO TRUSTEE'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7037

THOMAS S. UTSCHIG, Bankruptcy Judge.

**THIS CAUSE** came on for hearing before the Court, sitting by designation at Miami, Florida, on July 21, 1998, at 10:00 a.m., on the Trustee's *Motion to Compel Answers to Interrogatories Pursuant to Federal Rule of Civil Procedure 37 and Federal Rule of Bankruptcy Procedure 7037* (Court Paper # 29–1) (the "Motion to Compel") and the *Supplement to Trustee's Motion to Compel Answers to Interrogatories Pursuant to Federal Rule of Civil Procedure 37 and Rule 7037 of the Federal Rules of Bankruptcy Procedure* (Court Paper # 41–1) (the "Supplement").

### A. BACKGROUND

In the Motion to Compel, the Trustee sought non-evasive answers to three interrogatories[1] concerning the Debtor's creation

---

1. The subject interrogatories and the Debtor's answers are as follows:

3. Please state in detail and with particularity the purpose behind the creation of the Lawrence Family 1991 Intervivos Trust ("the Trust") and include in your answer the name and last known address of each and every individual with whom you consulted or who provided assistance to you in connection with the creation of the Trust.

3. *For Estate Planning purposes and retirement security. I consulted with Kapil Dev Joory and several of his associates whose names I cannot recall. His address is 4th Floor, Ken Lee Building, Edith Cavell Street, Port Louis, Mauritius.*

4. Please state in detail and with particularity the amount of the corpus of the Trust as of

this date and as of the date of the Debtor's Chapter 7 case (June 12, 1997). If there is any reason why you believe that you cannot answer this interrogatory or make the requisite inquiry to obtain the information necessary to answer this interrogatory, please set forth any such reasons in detail and with particularity.

4. *I have no knowledge of the amount of the corpus of the Trust as of June 12, 1997. I cannot acquire knowledge of the corpus of the Trust without being provided such information by the Trustee. Such information has never been provided to me in the past. I have made recent inquiry through my attorney who inquired of the Trustee's attorney. Herbert Stettin in Miami for the information. However, the Trustee refused to provide the information.*

of and his continuing interest in a certain self-settled, spendthrift-type trust.[2] The Supplement to the Motion to Compel seeks sanctions against the Debtor for his failure to answer the interrogatories and follow such other orders as may have been issued by this Court.

The Court found the Debtor's interrogatory answers to be incomplete and evasive and granted the Trustee's Motion to Compel. As such, pursuant to Federal Rule of Civil Procedure 26(d), incorporated by reference in Federal Rule of Bankruptcy Procedure 7026(d), this Court ordered the Debtor to appear at an evidentiary hearing commencing at 1:30 p.m. on July 21, 1998. At that time, the Trustee would have an immediate, supervised opportunity to obtain responsive answers from the Debtor. This hearing was intended to provide the Debtor with every possible opportunity to meet not only his general discovery obligations but also his ongoing obligation under the Bankruptcy Code to provide assistance to the Trustee. *See generally,* 11 U.S.C. § 521(3) and (4).[3]

The hearing continued over a three (3) day period during which this Court had a unique opportunity to observe the Debtor, who was the sole witness.[4] This Court endured eleven hours of what can candidly only be described as disingenuous and untruthful testimony from the Debtor. It seems clear that over the course of the Debtor's testimony he committed perjury on several occasions. Such conduct serves only to undermine not only the discovery process but also the integrity of the judicial system and the Bankruptcy Code. The Debtor voluntarily sought the protection of the Bankruptcy Code, yet seems unwilling to play by the rules and offer up full financial disclosure.[5] Even after numerous admonishments, the Debtor chose not to testify truthfully.[6]

The record in this case reveals a plethora of motions filed by the Debtor for protective orders, motions to quash subpoenas issued by the Trustee, voluminous pleadings to de-

---

5. Please set forth in detail and with particularity each and every disbursement that you have received from the Trustee from 1991 to the present date, including in your answer, without limitation the amount and date of each such distribution and indicate precisely what you did with each such distribution (i.e., identify the specific accounts into which the distribution was deposited or the parties to whom the distribution was disbursed).

5. *I don't know if there were any distributions to me from the Trust. If there were distributions they were between 1991 and 1994 and the funds would have been deposited in a bank account maintained for me or my related companies. Such deposits would have been accounted for by my former bookkeeper, Valerie Bach who maintained those accounts.*

2. The Debtor settled the trust on January 8, 1991, in the Jersey Channel Islands. On February 7, 1991, the trust was amended. Among the purposes of the amendment was to change the governing law to the Republic of Mauritius, an island nation located some 1,200 miles off the coast of Madagascar. Mauritius is considered one of the most densely populated areas in the world, with its nearly 1.2 million people jammed into an area of not quite 788 square miles. While it today boasts a thriving financial community, it is perhaps best known in scientific circles as the one-time home of the dodo bird, one of the first species driven to extinction by mankind.

3. Counsel for the Debtor objected to such proceedings in their entirety and argued that be-

cause the Motion to Compel was granted at the outset, the testimony of the Debtor did not relate to any pending motion. This Court overruled the Debtor's objection because part of the Trustee's requested relief included compelling the Debtor to answer the questions. The questioning was conducted before this Court pursuant to Rules 26(d) and 37(b)(2)(B) of the Federal Rules of Civil Procedure and Rules 7026(d) and 7037(b)(2)(B) of the Federal Rules of Bankruptcy Procedure.

4. The Debtor did attempt to call another witness, namely, the attorney for the trustee of the Mauritian trust (who, incidentally, has resisted any attempt by United States courts to exercise jurisdiction over the trust). The Court denied the Debtor's request to call this witness as the only relevant inquiry at the hearing was the Debtor's personal knowledge and this witness would have offered little, if any, information in this regard.

5. The Debtor filed a voluntary Chapter 7 petition on June 12, 1997. The Debtor was not forced into bankruptcy by virtue of an involuntary petition under 11 U.S.C. § 303; as a result, he cannot complain that the primary burden placed upon him is to engage in an honest and forthright disclosure of his assets. The punishment for failure to abide by these obligations is clear— the denial of the Debtor's discharge. *See* 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5).

6. Tr. at pp. 126, 130, 362, 389–395, 399, 400, 476.

feat the Trustee's attempts to depose the Debtor's mother in Mexico, an unorthodox Bankruptcy Rule 2004 examination of the Trustee by the Debtor, and two motions seeking to disqualify the Trustee and his counsel.[7]

This is a case of a sophisticated Debtor engaged in a pitched battle against the Trustee. The Debtor apparently believed that this case would simply slip through the cracks of the bankruptcy system. That did not happen, and the record in this case is not only a testimonial to the Trustee's efforts to get at the truth, but also to the Debtor's unrelenting campaign to conceal crucial information. Having witnessed the Debtor's tactics firsthand, this Court enters its findings of fact and conclusions of law.

## B. FINDINGS OF FACT

This Order is entered as the findings of fact and rulings of law required under Federal Rules of Bankruptcy Procedure 7052(a) and (c), which incorporate by reference Federal Rules of Civil Procedure 52(a) and (c). The Court makes the following specific findings of fact:

a) The Debtor filed a voluntary chapter 7 petition on June 12, 1997, thereby invoking the jurisdiction of this Court and rendering the Debtor bound by the obligations and responsibilities imposed upon him by the Bankruptcy Code.

b) Prior to October 19, 1987 (the day referred to in the securities industry as "Black Monday"), the Debtor was a successful options trader and had utilized Bear, Stearns & Co., Inc. ("Bear, Stearns") as his trading clearinghouse.[8] Tr. at p. 382. The Debtor testified that he graduated from the Massachusetts Institute of Technology. Tr. at p. 379. The Court finds this Debtor to be extremely sophisticated.

c) Following the stock market crash on October 19, 1987, the Debtor and his companies experienced a margin deficit with Bear, Stearns. The Debtor and Bear, Stearns disagreed about the extent of the margin deficit. As a result, the Debtor commenced an arbitration proceeding against Bear, Stearns. Bear, Stearns counterclaimed against the Debtor. The arbitration proceeding spanned some forty-two (42) months.

d) The arbitrator's award in favor of Bear, Stearns in an amount in excess of $20 Million was handed down on or about March 15, 1991. The arbitrator's award was confirmed by the United States District Court for the Southern District of New York on or about February 17, 1993, and thereafter, on or about April 7, 1993, a corrected final judg-

---

**7.** Chief Bankruptcy Judge A. Jay Cristol entered an *Order Denying Debtor's Motion to Compel Disclosure of Actual or Potential Compensation Agreements and to Disqualify Trustee and His Counsel* dated March 25, 1998 (Court Paper # 195–1), in response to the Debtor's *Motion to Compel Disclosure of Actual or Potential Compensation Agreements and to Disqualify Trustee and His Counsel* (Court Paper # 94–1). In the March 25, 1998 Order, Chief Judge Cristol made specific findings that the Debtor's efforts to disqualify the Trustee and his counsel were "vicious, outrageous, baseless and unsupported by credible evidence." March 25, 1998 Order at paragraph (1)(n). In his March 25, 1998 Order, Chief Judge Cristol found the testimony of *both* the Debtor and his counsel at the hearing to be not credible and not believable. March 25, 1998 Order at paragraph (1)(e). The Debtor did not appeal or seek reconsideration of these findings.

In addition, the *Debtor's Memorandum in Opposition to the Continued Retention of Berger Davis & Singerman, P.A. as Counsel to the Trustee* (Court Paper # 129–1) sought to disqualify Trustee's counsel on grounds of an unproved and non-existent conflict of interest claim. Chief

Judge Cristol, in his February 5, 1998 *Order Granting in Part and Denying in Part Trustee's Supplemental Motion for Employment of Berger Davis & Singerman, P.A. as Attorneys for the Trustee*, published at 217 B.R. 658 (Bankr. S.D.Fla.1998), once again found the Debtor's testimony to be not believable. Chief Judge Cristol's February 5, 1998 Order, including its sixteen (16) specific findings of fact, have been upheld in their entirety upon the Debtor's appeal to the United States District Court for the Southern District of Florida (Court Paper # 278–1). The Debtor's substantial lack of veracity in his voluntary bankruptcy case is amply demonstrated. He continued this lack of truthfulness throughout the hearings which are the subject of this Order.

**8.** The Debtor testified that prior to the stock market crash of October 19, 1987, his trading company was one of the largest on the Chicago Board of Trade and a major player on other national exchanges. Tr. at p. 432. He has also testified that he has attempted to expand his business into international markets in Asia and Europe. Tr. at p. 75.

ment in favor of Bear, Stearns against the Debtor and certain of his trading companies was entered by the United States District Court for the Southern District of New York in the amount of $20,412,115.00.

e) On or about January 8, 1991, just 66 days prior to the arbitration award against the Debtor and in favor of Bear, Stearns in excess of $20 Million, the Debtor allegedly settled the Lawrence Family 1991 Intervivos Trust (ultimately the "Mauritian Trust") in the Jersey Channel Islands.[9] Trustee's Exhibit 4 in evidence.

f) The trust was amended on or about February 7, 1991, some 36 days before the handing down of the arbitration award. Trustee's Exhibit 4B in evidence.[10] The Debtor testified that the original Trust Indenture of January 8, 1991, and the February 7, 1991, amendment constitute but one document. Tr. at p. 107. The Court cannot accept the Debtor's testimony that the original Indenture and the February 7, 1991, amendment were but one document or that they were executed at the same time. The Debtor's testimony in this regard is disjointed and confusing. The original Trust Indenture appears to be a "form" document which refers to the Debtor only once by name, and then only by a typewritten insertion. The only conclusion to be drawn from the documents and testimony is that the original trust document did not provide the Debtor with

sufficient protection from his creditors, necessitating the subsequent execution of the amendment.[11]

g) The Debtor repeatedly testified before this Court that the Mauritian Trust was set up for his estate planning and retirement security purposes, and that an important motive was the knowledge that the money would be available for him in his old age. Tr. at p. 77. Yet, when questioned by the Court, the Debtor refused to acknowledge that shielding his assets from his creditors was an important aspect of the arrangement. This is absurd, given the fact that absent this shielding effort, there would be no money left for his retirement as creditors would have taken every penny they could find. The Trustee and the Court repeatedly asked the Debtor to acknowledge that shielding assets is the primary, if not only, reason for setting up an offshore trust. He refused to do so.

h) The Debtor could not identify any specific retirement goals, other than to state that they were to protect him in his old age. Tr. at p. 77. More importantly, the Debtor could not reconcile how the apparent divestiture of his interest in the Mauritian Trust, and the Mauritian trustee's apparent ability to select additional beneficiaries and to thereafter distribute the entire trust to these new beneficiaries, was in any manner consistent with his retirement security goals.[12]

---

9. The Debtor did not produce a copy of the original Trust Indenture bearing evidence of execution by the Debtor. Thus, the Chapter 7 Trustee questions whether a valid trust ever, in fact, existed. Further, none of the amendments to the trust at Trustee's Exhibits 4 B, C or D bear any evidence of execution by the Debtor.

10. The February 7, 1991, amendment to the trust is important to the Debtor's position because it (i) contains specific spendthrift language and (ii) moves the proper law of the trust to the Republic of Mauritius.

11. The protections included in the amendment which were omitted from the original Indenture include the spendthrift provisions and the shift of the trust and its governing law to Mauritius. Mauritian law appears to be even more "debtor-friendly" than the Jersey Channel Islands. For example, the Debtor has emphasized his belief that Mauritian law imposes criminal penalties upon anyone, including the Mauritian trustee, who discloses information about the trust. Tr. at

p. 45. Mauritius also has the added benefit of its location—the other side of the world. Candidly, it appears the Debtor would have set the trust up on Mars if he could have.

12. The Mauritian trustee has numerous powers which are inconsistent with the Debtor's avowed motives for creating the trust, including the power to exclude the Debtor, the power to name new beneficiaries, the ability to distribute the entire trust corpus as he sees fit, and the right to disregard any inquiries for information from the beneficiaries. Nonetheless, the Debtor retained substantial powers as settlor of the trust, for example, to remove and replace trustees in his absolute discretion. Further, while the March 22, 1995, Declaration purports to disenfranchise the Debtor as a beneficiary and clarifies him as an "Excluded Person," it does not appear that the clarification was irrevocable. It appears that the Mauritian trustee could again amend the trust, for example, after the Debtor were to obtain a discharge by this Court—and again deem the Debtor to be a beneficiary.

i) Despite his claim that the trust was for his retirement, the Debtor testified that he had no feelings one way or the other concerning the alleged independent decision by the trustees of the Mauritian Trust to divest the Debtor of his beneficial interests in the trust. Tr. at p. 208–209. The Debtor testified that while it was "difficult" to deliver the trust assets to virtual strangers, he simply accepted that the Mauritian trustees were merely exercising their "fiduciary duties" in subsequently excluding him from his own trust. According to the Debtor, there was nothing that he could do about it. Tr. at p. 359. Yet at the same time, the Debtor testified that neither he nor his representatives took any substantive actions to protect his interests in the trust, or to protest his alleged divestiture and exclusion from the trust. Tr. at p. 221, 228. This Court finds it impossible to believe the Debtor's testimony that he simply walked away from virtually all of his assets without any sort of struggle.[13]

j) The Debtor also testified that a purpose behind the creation of the Mauritian Trust was to provide for charities. Tr. at p. 77. This Court has reviewed the original Trust Indenture and the amendments (Trustee's Exhibits 4A, 4B, 4C and 4D, which the Debtor has testified are all of the amendments to the trust). Neither the initial Trust Indenture nor any of the amendments indicate any charities as beneficiaries of the Mauritian Trust.

k) As with much of the Debtor's testimony, there are significant discrepancies regarding the value of the assets placed into the trust. Still, the Debtor testified that when the trust was settled, the assets transferred to the trust represented in excess of ninety percent (90%) of his liquid assets. Tr. at p. 184. This Court finds it impossible to believe that the Debtor surrendered ninety percent (90%) of his assets to a stranger on the other side of the world without maintaining some control over the assets. His assertion that he has "no feelings" about the loss is wholly inconsistent with his only stated purpose for the creation of the Mauritian Trust—namely, estate planning and retirement security.

l) The Debtor testified that he only met and/or spoke with the intended trustee of the Mauritian Trust, Kapil Dev Joory ("Joory"), a resident Mauritian, four or five times over a two-year period in London, England. Tr. at p. 74. The Debtor testified that he did not undertake any due diligence, such as confirming Joory's qualifications with other clients, and he could not recall if he contacted any bank references provided by Joory. Tr. at p. 184–186. The Debtor further testified that he was introduced to Joory at a social function (Tr. at p. 75), and that based upon his instinctual assessment of Joory's capabilities (Tr. at p. 184–186), he decided to designate Joory as the trustee of his trust.[14] The Debtor also testified that he did not know how much the Mauritian trustee charged for his services, either to establish the trust or to administer and maintain it, and that the Debtor did not have or maintain any fee schedule. Tr. at p. 192. Again, this testimony is not credible or believable.

m) On numerous occasions the Debtor swore that the initial corpus of the Mauritian Trust was approximately $7.0 Million. *See, e.g.,* Debtor's schedule B, item 18. During the evidentiary hearing, however, the Debtor testified that the original corpus of the Mauritian Trust was no more than $4.0–$4.5 Million. Tr. at p. 169. The Debtor testified that the $7.0 Million figure was based upon uncertain "valuations" derived from a "list" of available assets which he had been willing to commit to the Mauritian Trust. Tr. at p. 162. The Debtor testified that as the earmarked trust assets were liquidated, he would remit the proceeds, or a portion thereof, to the Mauritian trustee. This Court is

---

**13.** At one point during the hearing, the Debtor stated he had not even thought about the trust in years. Tr. at p. 111. Given the ongoing litigation which the Debtor stated had ruined his health, this flippant statement only further highlights the Debtor's cavalier attitude toward the judicial process and his obligations under the Bankruptcy Code.

**14.** This is in direct contradiction of an affidavit filed in earlier litigation where the Debtor stated he had never met or spoken with Joory. This is only one of the instances where the Debtor appears to have perjured himself in a blatant attempt to continue the charade of an "independent" trust over which he has no control.

struck by the inability of the Debtor to produce such a list, by the Debtor's alleged inability to recall what assets were on the list, and by the apparent failure of the Debtor to have maintained a copy of such an important list. Tr. at p. 163. In addition, the Court finds it remarkable—and unbelievable—that when the Debtor was shown a copy of his amended schedules, listing some twenty-one (21) partnerships and business entities, the Debtor could identify only one, IPC–Smith/Stratford Assoc., Ltd., as a partial source of the initial corpus of the Mauritian Trust. Tr. at p. 265.

n) The Debtor testified several times in direct response to questions posed by both this Court and Trustee's counsel that the pendency of the arbitration proceedings with Bear, Stearns played absolutely no role whatsoever in his decision to transfer between $4.0 Million and $7.0 Million to the trust. Tr. at pp. 70, 363, 365. Whether one characterizes the motive as "retirement security" or not, placing assets this far from the reach of creditors inherently evidences a singular intention. The purpose of the trust was clearly to shield the Debtor's assets from a creditor which the Debtor feared was about to obtain a staggering $20 Million arbitration award against him. The timing of the trust's creation is further evidence of this intent.

o) The Debtor testified several times before this Court that he did not contact the Mauritian trustees about his financial difficulties in the United States. He claims to have no idea as to why the March 22, 1995, Declaration labeled him an "Excluded Person" under the trust. Trustee's Exhibit 4A (last two pages) in evidence. The Debtor also claimed ignorance about the other amendments to the Mauritian Trust and their apparent effect upon his rights thereunder as either settlor or beneficiary. Tr. at pp. 195–197, 201–202, 204. The Debtor's counsel suggested to this Court that perhaps the trustee of the Mauritian Trust, from his location outside the United States,[15] was monitoring the Debtor's circumstances. Tr. at p. 484. This suggestion requires the

Court to believe that the Mauritian trustee simply acted on his own account when excluding the Debtor as a beneficiary from the Debtor's own trust. This conclusion begs the question—why would the Mauritian trustee pursue such a course of action? It does not benefit the Debtor, to whom the Mauritian trustee would arguably owe fiduciary responsibilities, since the Debtor was a beneficiary of the trust. Unless of course to do so did indeed further the Debtor's interests—namely, his interest in never letting his creditors have the money. The Court finds both the Debtor's testimony in this respect and the argument of his counsel to be unbelievable.

p) As indicated previously, the Debtor's lack of candor concerning the Mauritian trustee is further demonstrated by the affidavit he filed in the pending proceedings in the United States District Court for the Southern District of Florida (Civil Action No. 93–6489–CIV–KING). In that affidavit, the Debtor swore unequivocally that "I do not have nor have I ever had any communications or dealings with Kapil Dev Joory who is a resident Mauritian and the trustee of the Trust." Trustee's Exhibit 2 in evidence. This sworn affidavit is in direct contravention to the Debtor's sworn response to interrogatory no. 3 ("I consulted with Kapil Dev Joory and several of his associates whose names I cannot recall") and his testimony throughout the instant evidentiary hearing. The Debtor also admitted numerous contacts with Joory during his testimony in these proceedings.

q) The record is clear, both in the main case and in the adversary proceeding, that the Debtor and his representatives have gone out of their way to avoid meeting their affirmative obligation to cooperate with the Trustee. The evasive and incomplete answers to interrogatories concerning the Mauritian Trust are but the most recent example of the purposeful recalcitrance of this Debtor. During the course of the three (3) day evidentiary hearing, this Debtor squandered numerous opportunities to provide honest an-

---

**15.** The trustee claims the United States has no jurisdiction over him and apparently does no business inside the United States.

swers regarding the Mauritian Trust. Tr. at pp. 126, 130, 362, 389–395, 399, 400, 465.

## C. CONCLUSIONS OF LAW

Based upon the record and the foregoing findings of fact, this Court makes the following conclusions of law:

■ 1. The Debtor has an affirmative obligation to participate in discovery in an honest, non-evasive and complete manner. *Dollar v. Long Mfg.*, 561 F.2d 613 (5th Cir. 1977).[16]

■ 2. As the United States Supreme Court noted in *United States v. Procter & Gamble*, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), it is axiomatic that the purpose of discovery is to make a trial "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest extent possible."

■ 3. The Trustee asked for responses to several simple interrogatories from the Debtor. The Trustee's task is to locate assets and make distributions to creditors, a job which obligates the Trustee to learn about the Mauritian Trust. And it is the Debtor's obligation upon filing bankruptcy to be forthright in providing financial information. No one is obligated to recreate the Debtor's financial affairs; that task is his alone. *See* 11 U.S.C. § 521(3) and (4); *In re Schick*, 215 B.R. 4 (Bankr.S.D.N.Y.1997). The legislative history is clearly supportive of this notion. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), *U.S.Code Cong. & Admin.News*, 1978, p. 5787. In short, the Bankruptcy Code makes complete financial disclosure a "condition precedent" to the privilege of a discharge. *Broad Nat'l Bank v. Kadison*, 26 B.R. 1015, 1018 (D.N.J.1983).

■ 4. Rule 37(a)(3) of the Federal Rules of Civil Procedure and Rule 7037(a)(3) of the Federal Rules of Bankruptcy Procedure treat evasive or incomplete answers to interrogatories, such as those submitted and filed by the Debtor, as a complete failure to respond. *Dollar v. Long Mfg.*, 561 F.2d 613 (5th Cir.1977).

5. Upon the Debtor's submission of the deficient answers to interrogatories, the Trustee filed the Motion to Compel. The Trustee filed the Supplement to the Motion to Compel seeking sanctions to the extent that the Debtor failed to abide by any Orders entered regarding the Motion to Compel. This Court has previously ruled that the answers which the Debtor gave to the subject interrogatories were evasive and incomplete, justifying the entry of an *Order Granting Trustee's Motion To Compel Answers To Interrogatories Pursuant To Federal Rule of Civil Procedure 37 and Federal Rule of Bankruptcy Procedure 7037.*

■ 6. In the context of nondischargeability, the Court is mindful that the objections to discharge found in § 727 are to be construed strictly against the Trustee and liberally in favor of the Debtor. *See Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996); *In re Pimpinella*, 133 B.R. 694, 697 (Bankr. E.D.N.Y.1991); *In re Rusnak*, 110 B.R. 771, 776 (Bankr.W.D.Pa.1990). It is important to note, however, that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor. *Juzwiak*, 89 F.3d at 427; *Pimpinella*, 133 B.R. at 697. The sections of 11 U.S.C. § 727 cited by the Trustee in the Complaint and on which default judgment is sought as a sanction reflect this policy decision. For example, § 727(a)(3) provides that a debtor who has "concealed, destroyed, mutilated, falsified or failed to keep or preserve" records regarding his financial condition shall be denied a discharge. Debtors must supply records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *In re Martin*, 141 B.R. 986, 995 (Bankr.N.D.Ill. 1992); *see also Juzwiak*, 89 F.3d at 427; *Meridian Bank v. Alten*, 958 F.2d 1226 (3d Cir.1992); *In re Cox*, 904 F.2d 1399 (9th Cir.1990). The provision ensures that trust-

---

**16.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

ees will receive sufficient information to reconstruct the debtor's financial dealings. The burden is not on the trustee to organize and reconstruct the debtor's business affairs. *Juzwiak,* 89 F.3d at 429; *Pimpinella,* 133 B.R. at 698. The debtor has an affirmative duty to "maintain and retain" comprehensible records. *Juzwiak,* 89 F.3d at 429; *see also In re Frommann,* 153 B.R. 113, 118 (Bankr.E.D.N.Y.1993).

■ 7. The other sections of § 727(a) cited by the Trustee place similar obligations on the Debtor. Under § 727(a)(4)(A), a debtor shall not receive a discharge if he has hidden or transferred property within the year prior to the bankruptcy. The debtor may not make a "false oath or account" or withhold any "recorded information" regarding the debtor's financial affairs. *See* 11 U.S.C. § 727(a)(4)(A) and (a)(4)(D). Finally, the debtor may not receive a discharge if he fails to satisfactorily explain a loss of assets. *See* 11 U.S.C. § 727(a)(5). The global purpose of these sections is clear. A debtor must come into this Court and make full disclosure of his finances. He may not place the burden of "discovering" assets upon others. Section 727 makes "complete financial disclosure a 'condition precedent' to the privilege of discharge." *Juzwiak,* 89 F.3d at 429.

■ 8. In this case, the Debtor has been shockingly less than candid with the Trustee and with the Court. A default judgment such as is sought by the Trustee is a severe penalty for discovery abuse. Yet the Debtor's web of deception strikes at not only the requirement of honesty mandated by the discovery rules, but also at the foundation of the bankruptcy system. As the Supreme Court explained:

> ... the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*National Hockey League, et al. v. Metropolitan Hockey Club, Inc., et al.,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). He would have this Court countenance a complete lack of financial disclosure of absurdly epic proportions. A bankruptcy discharge for a debtor who engages in this type of conduct should be as rare as the dodo bird which once graced the shores of Mauritius. Put another way, to grant the Debtor a discharge, the Court would not only be required to ignore his discovery abuses, but to rip § 727 from the United States Code as well.

■ 9. This Court is not required to provide a string of meaningless opportunities to the Debtor to further evade his responsibilities. Pursuant to Rule 26(d) of the Federal Rules of Civil Procedure and Rule 7026(d) of the Federal Rules of Bankruptcy Procedure, the Court may, in the interest of justice, make such orders as are appropriate in respect of the timing and sequence of discovery. *See Crawford v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1597, 140 L.Ed.2d 759 (1998) (the provisions of Rule 26(d) "create[s] many options for the district judge."). *See also In re Sardo Corp.,* 1995 WL 871168 *5, 1995 U.S. Dist. LEXIS 16885 at 13 (E.D.Mich.1995) ("It would be far too simple for this Court to simply ... extend the discovery deadline, because to do so would be to grant to the defendant unwarranted further delay, and delay which was of his own making."). To ascend through a progression of interim sanctions would have absolutely no effect other than to further delay and trivialize the judicial process. *See Phipps v. Blakeney,* 8 F.3d 788, 790 (11th Cir.1993).

■ 10. This Court concludes that the Debtor's repeated failure to answer the Trustee's questions in anything but evasions and half-truths constitutes a willful and bad faith failure to obey this Court's discovery orders. *National Hockey League, et al. v. Metropolitan Hockey Club, Inc., et al.,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Societe Internationale Pour Participations Industrielles et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Malautea v. Suzuki Motor Co., Ltd., et al.,* 987 F.2d 1536, 1542 (11th Cir.1993).

■ 11. When the Court reviews the evidence presented and determines that a liti-

gant has engaged in willful and bad faith failure to meet his discovery obligations, the Court is empowered to impose sanctions in accordance with Rule 37(b) of the Federal Rules of Civil Procedure and Rule 7037(b) of the Federal Rules of Bankruptcy Procedure. Such sanctions include striking the Debtor's pleadings and entering a default judgment against the Debtor. Rule 37(b)(2) of the Federal Rules of Civil Procedure and Rule 7037(b)(2) of the Federal Rules of Bankruptcy Procedure. *National Hockey League, et al., supra; Phipps v. Blakeney,* 8 F.3d 788, 790–91 (11th Cir.1993).

12. Accordingly, the facts alleged in the Trustee's Complaint, including without limitation those alleged in Count I of the Complaint regarding the Debtor's interest in the Mauritian Trust and his continuing concealment thereof, are deemed to be established. Fed.R.Civ.P. 37(b)(2)(A) and Fed. R. Bankr.P. 7037(b)(2)(A); *see also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.,* 53 F.3d 851 (7th Cir.1995).

13. The purpose of the Bankruptcy Code is to allow debtors to reorganize their affairs and enjoy a new opportunity in life. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). However, this fresh start is limited to the "honest but unfortunate" debtor. *Id.,* 498 U.S. at 287, 111 S.Ct. 654. When in bankruptcy, debtors may claim exempt property, and they may engage in pre-bankruptcy "exemption planning." Indeed, debtors will not be penalized for making "full use" of available exemptions. *Matter of Smiley,* 864 F.2d 562, 567 (7th Cir.1989). Exemption planning, however, is a far cry from the type of hide-the-ball, "catch me if you can" conduct evidenced by the Debtor in this case. Unfortunately, he is apparently not alone in his belief that this conduct is acceptable. There is a growing body of case law surrounding debtors who have secreted their assets in distant jurisdictions with laws which would make the stereotypical Swiss banker proud. For example, in *In re Portnoy,* 201 B.R. 685 (Bankr.S.D.N.Y.1996), a case with strikingly similar facts, the court held that to apply the law of the chosen offshore trust situs, in that case the Jersey Channel Islands, would "offend strong [state] and Federal bankruptcy policies if applied." *Id.* at 698.

14. The *Portnoy* court further stated that "while under normal circumstances parties are free to designate what state's or nation's law will govern their rights and duties, where another state or nation has a dominant interest in the transaction at issue, and the designated law offends a fundamental policy of that dominant state, the court may refuse to apply the foreign law." *Id.* The court held that equity would not countenance a debtor unilaterally removing "the characterization of property as his simply by incorporating a favorable choice of law provision into a self settled trust of which he is the primary beneficiary." *Id.* at 701.[17]

15. In the United States Bankruptcy Court for the Southern District of Florida, the holding and the reasoning of *Portnoy* has recently been adopted by Judge Paul G. Hyman, Jr., in *In re Cameron,* 223 B.R. 20 (Bankr.S.D.Fla.1998). Judge Hyman applied New York trust law and noted that "it is irrelevant that in creating the discretionary trust for her benefit the settlor did not intend to defraud her creditors or was solvent at the time of the creation of the trust. It is against public policy to permit the settlor beneficiary to tie up her own property in such a way that she can still enjoy it but prevent her creditors from reaching it." *Id.* at 24. This Court is persuaded by the decisions of *Portnoy, Brooks* and *Cameron.* The Debtor's rights and obligations under the Mauritian Trust are governed by Florida and federal bankruptcy law, which have an overriding interest in the trust, and not the law of the Republic of Mauritius. Accordingly, the

---

**17.** This issue was also recently addressed in *In re Brooks,* 217 B.R. 98 (Bankr.D.Conn.1998). In *Brooks,* the court held that certain assets placed in an offshore trust in Bermuda and the Jersey Channel Islands were nevertheless assets of the bankruptcy estate and subject to the Court's jurisdiction, and refused to allow the laws of the foreign jurisdiction to control because these laws were repugnant to the public policy of Connecticut and the United States.

trust corpus is property of the estate under 11 U.S.C. § 541.[18]

16. This Court believes that the Debtor perjured himself during the course of the evidentiary proceeding. This Court will make an appropriate reference to the Office of the United States Attorney for further investigation·in connection with this finding.

17. Based upon the evidence presented in the course of the three (3) day evidentiary hearing, the record before the Court in this case, the argument of counsel, a review of the citation of law from the parties and the foregoing conclusions and findings, the relief sought in the Trustee's Supplement to Trustee's Motion to Compel is hereby **GRANTED**.[19]

18. A separate Order granting a final default judgment against the Debtor, Stephan Jay Lawrence, under Counts I through XVIII, inclusive, of the Trustee's Complaint Objecting to Debtor's Discharge (11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(5)) will be entered by this Court.

19. This Order is without prejudice to the rights of the Trustee to seek sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, Rule 9011 of the Federal Rules of Bankruptcy Procedure, or the provisions of 28 U.S.C. § 1927.

---

18. The Court has reviewed the proffered testimony of Herbert Steffin, the attorney for the Mauritian Trust. Tr. at p. 486. Had Mr. Steffin testified, nothing contained in his proposed testimony would have altered the Court's conclusions in this regard or in connection with any other matter covered in this Order.

19. At the July hearing, the Court informed the parties that prior to the Court's entry of its order in this matter, the Debtor might consider assisting the Trustee in gaining control of the trust corpus, since returning the money could help resolve his present difficulties. On August 18, 1998, the Debtor filed an "emergency motion" seeking instructions from the Court on how he could avoid denial of his discharge by "assisting" the Trustee. As a preliminary matter, the Court would observe that the Court was merely suggesting that the parties had the ability to resolve the matter themselves through settlement. Nonetheless, the Court conducted a telephone hearing on the motion, at which time the Court denied the Debtor's motion. The Debtor's argument remains the same. While he purports that he will do "anything" to assist the Trustee in recovering the money, he refuses to offer any suggestions or affirmative steps. He provides no additional information beyond his obviously incomplete prior testimony. During the telephone hearing, the Court asked the Trustee what additional provisions the Trustee desired in this order. Based upon the Trustee's request, the Court continues its prior order that the Debtor may not contact the trust or its representatives without the Trustee's permission or order of this Court. Nothing in this order precludes the Trustee from seeking further orders regarding the Mauritian Trust.